## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Tanya Renea Youness,                                Civ. No. 17-4108 (DSD/BRT)

        Plaintiff,

v.                                                         **REPORT AND**
                                                           **RECOMMENDATION**

Nancy A. Berryhill,
Acting Commissioner of
Social Security,

        Defendant.

---

James H. Greeman, Esq., Greeman Toomey PLLC, counsel for Plaintiff.

Gregory G. Brooker, Esq., Pamela A. Marentette, Esq., United States Attorney's Office, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Tanya Renea Youness seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 13, 16.) For the reasons stated below, the Court recommends that Plaintiff's Motion for Summary Judgment be granted and Defendant's Motion for Summary Judgment be denied.

# BACKGROUND

## I.    Procedural History

Plaintiff applied for Title II disability insurance benefits ("DIB") on November 3, 2014, alleging a disability onset date of October 8, 2014. (Tr. 184.)[1] The Social Security Administration ("SSA") denied Plaintiff's application on January 8, 2015, and again after reconsideration on March 18, 2015. (Tr. 123–27, 130–32.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on June 16, 2016. (Tr. 44–97.) The ALJ denied Plaintiff's application on August 30, 2016, and the Social Security Appeals Council denied her request for review on July 17, 2017. (Tr. 8–32, 1–7.) The Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

On September 1, 2017, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) On November 24, 2017, Defendant filed an Answer along with a certified copy of the administrative record. (Doc. Nos. 8, 9.) The parties have now filed cross-motions for summary judgment pursuant to the Local Rules. (Doc. Nos. 13, 16.) In her motion, Plaintiff alleges two errors made by the ALJ. First Plaintiff argues that the ALJ improperly rejected subjective complaints that were consistent with the record as a whole. (Doc. No. 14, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 13–16.) Second, Plaintiff argues that the ALJ's Residual Functional Capacity ("RFC") Assessment is inconsistent with objective evidence regarding limitations of severe

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 9).

impairments. (*Id.* at 16–18.) Defendant disagrees and requests that the Court affirm the Commissioner's decision because substantial evidence supported the ALJ's determinations regarding Plaintiff's credibility and RFC. (Doc. No. 17, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 4–13.)

## II.   Factual Background

### A.  Plaintiff's basic information

Plaintiff was born on September 24, 1966, and at the time of her alleged onset date of October 8, 2014, she was 48 years old. (Tr. 52, 98, 235.) Plaintiff is single and currently lives with her mother. (Tr. 185, 282.) She has a high school degree and self-studied to become a nationally certified pharmacy technician. (Tr. 53, 208.) From 1998 to 2004, Plaintiff worked full-time as a consumer advocate for Blue Cross Blue Shield. (Tr. 208.) The main responsibilities of her job included helping consumers with coverage issues and serving consumer needs based on their policies. (Tr. 54–58.) From May 2005 to October 2014, Plaintiff worked full-time as a certified pharmacy technician. (Tr. 208.) Plaintiff stopped working on October 8, 2014, and on October 18, 2014, Plaintiff resigned from her pharmacy technician job, allegedly following the advice of her surgeon. (Tr. 59, 74, 337.)

### B.  Plaintiff's medical records

Plaintiff has had a history of diverticulitis since 2006 and had a surgery in 2011 where twenty-four centimeters of her colon was removed. (Tr. 475, 604.) Most of Plaintiff's relevant medical records, however, come from the 2014 to 2016 timeframe. Plaintiff was hospitalized from May 2 to May 4, 2014, for abdominal pain and was

discharged with a diagnosis of recurrent diverticulitis and underlying depression with anxiety. (Tr. 292–93.) Plaintiff was hospitalized again from May 9 to May 11, 2014, with abdominal pain and diarrhea, reporting "approximately 12 very watery stools" within less than one day. (Tr. 314.) She was discharged with a diagnosis of clostridium difficile colitis, recent diverticulitis, and hypertension. (Tr. 306.) Plaintiff returned to the emergency room on May 21, 2014, with diarrhea, reporting four episodes on that day. (Tr. 320–21.)

Plaintiff was again seen in the emergency room for abdominal pain on October 8, 2014. (Tr. 324.) She returned to the emergency room on October 12, 2014, with rectal bleeding, and was diagnosed with diverticulitis of colon. (Tr. 330.) She was hospitalized between October 13–17, 2014, for abdominal pain, and was discharged with a diagnosis of acute colonic diverticulitis. (Tr. 336–37.) At that time, Plaintiff's discharge notes indicated that the surgeon advised her that "she will need to go on disability, as her diverticulitis [f]lare, seems to be precipitated by stress from her work as a pharmacy tech." (Tr. 337.) Plaintiff had a post-hospitalization follow-up on October 27, 2014, with April Fitzloff, PA.[2] (Tr. 523–25.) Plaintiff complained about abdominal pain and looser stools, and was given a diagnosis of diverticulitis. (*Id*.) Plaintiff visited Fitzloff again on October 29, 2014, for anxiety and was given an assessment of "anxiety and depression surrounding a chronic medical illness with recurrent diverticulitis." (Tr. 519–21.)

On November 25, 2014, Dr. Marc C. Osborne performed a colonoscopy on Plaintiff, which confirmed colon diverticulitis. (Tr. 441–42.) During a surgical

---

[2]    Physician Assistant Fitzloff is Plaintiff's treating provider.

consultation on December 5, 2014, Dr. Osborne further recommended a colectomy. (Tr. 445–47.) Following a visit with Dr. Osborne on January 26, 2015, which confirmed the diagnosis of colon diverticulitis, Plaintiff proceeded with a redo laparoscopic left colectomy and was hospitalized from January 28, 2015 to February 2, 2015. (Tr. 463–66.) Twenty-four centimeters of Plaintiff's rectum, sigmoid, and descending colon were removed. (Tr. 475.)

On February 9, 2015, Plaintiff visited Physician Assistant Fitzloff for ongoing pain from the procedure. (Tr. 497.) Later that month, on February 20, 2015, Plaintiff was seen by Dr. Osborne for surgery follow-up. (Tr. 581.) Plaintiff stated during this visit that overall she was "doing pretty well. She is having regular bowel movements. She is minimizing her narcotic use." (*Id*.) Approximately three weeks later, on March 18, 2015, Plaintiff reported having eight bowel movements daily and sixteen to twenty foaming white stools on that day. (Tr. 597.) The following day, Plaintiff reported to the emergency room with abdominal pain and was diagnosed with diarrhea. (Tr. 621–22.) On March 26, 2015, Plaintiff reported twelve to fifteen episodes of diarrhea with some bleeding within six hours. (Tr. 599.)

On April 10, 2015, Plaintiff visited Dr. Osborne for follow-up. (Tr. 600.) She again reported diarrhea, having "up to three bowel movements per day." (*Id*.) Dr. Osborne suggested that her ongoing symptoms could be the result of anxiety rather than complications from the surgery. (Tr. 602.) He advised Plaintiff to check in with him in a month, and if she was still having altered bowel habits, he would recommend a colonoscopy. (*Id*.) Five days later, Plaintiff visited Physician Assistant Fitzloff, reporting

eight bowel movements on an average day and fourteen to thirty bowel movements on a

worse day. (Tr. 614.) On April 27, 2015, Plaintiff met with Dr. Sarah Grohn,

Dr. Osborn's colleague, reporting pain, frequent gas, and passing mucus with gas.

(Tr. 604.) Plaintiff also reported having soft stool eight to ten times a day, and up to

twenty times on a bad day, since the colectomy surgery on January 28, 2015, and up to

twenty stools on a bad day, every couple of weeks. (*Id*.) Dr. Grohn noted in Plaintiff's

"Assessment/Plan" that "[a]s expected, some stool frequency, urgency, and alteration in

bowel function can occur" after a hemicolectomy. (Tr. 606.) Dr. Grohn also talked to

Plaintiff about further treatment, but Plaintiff stated she "feels like things are getting

better." (*Id*.) Dr. Grohn advised Plaintiff to follow up in eight weeks, "sooner if she is

having worsening symptoms." (*Id*.)

After the visit on April 27, 2015, Plaintiff's complaints during doctor visits

changed rather dramatically. While abdominal pain and frequent bowel movements were

her chief complaints in almost every hospital visit before April 27, 2015, they were not

chief complaints after that and were only occasionally mentioned upon a review of all

symptoms. Below is a summary of Plaintiff's chief complaints from May 2015 to

May 2016:

- On May 15, 2015, Plaintiff visited Physician Assistant Fitzloff for depression and anxiety, and reported that she "had a really good visit and feels better about her gastrointestinal symptoms." (Tr. 616–17.)

- On May 26 and June 10, 2015, Plaintiff visited Linda Smith, APRN, CNP, for the evaluation of hypothyroidism, with her chief complaint being a thyroid problem. (Tr. 743–44, 751–52.) In a list of possible conditions, Smith noted after the category "Diarrhea/Constipation," "Yes: frequent bowel movements, secondary to colon surgery." (Tr. 744, 752.)

- On July 3, 2015, during a visit with Physician Assistant Fitzloff, Plaintiff expressed concern with ongoing symptoms including fatigue, anxiety, loss of appetite, weight gain, and skin and hair problems; Plaintiff did not mention abnormal bowel movements. (Tr. 695–97.)

- On July 28, 2015, Plaintiff sought medical attention from Hans C. Bengtson, MD, and Nicholas W. Krawczyk, MD, for an ankle sprained while on vacation. (Tr. 686–94.)

- On August 5, 2015, Plaintiff visited Physician Assistant Fitzloff for high blood pressure, skin related concerns, and anxiety. (Tr. 682–84.)

- On September 9, 2015, Plaintiff had a follow-up visit with Physician Assistant Fitzloff for blood pressure, anxiety and depression, and weight gain. (Tr. 677–81.) Plaintiff stated that "she cannot believe she cannot lose weight when she walks two miles a day and only eats a salad." (Tr. 680.)

- On September 14 and October 13, 2015, Plaintiff visited Amer N. Kalaaji, MD, for skin lesions and hair loss. (Tr. 649–56.)

- On November 4, 2015, Plaintiff visited Physician Assistant Fitzloff for hypertension, depression, and anxiety. (Tr. 674.)

- On December 3 and December 17, 2015, Plaintiff visited Ayesha Ebrahim, MD, for weight gain, fatigue, headaches, and anxiety. (Tr. 764, 770.) For these visits, in a list of possible conditions, Dr. Ebrahim noted "Yes: frequent bowel movements, secondary to colon surgery." (*Id.*)

- On January 6, 13, 18, and March 11, 2016, Plaintiff visited Physician Assistant Fitzloff for hypertension and left arm numbness. (Tr. 669–71, 664–65, 704, 659–60.)

- On February 3, 2016, Plaintiff visited Dr. Frederick Harris for cervical radicular pain. (Tr. 715.) In his progress notes, Dr. Harris indicates he reviewed Plaintiff's various symptoms; for "Gastrointestinal" he noted "diverticulitis with large intestine resection." (Tr. 717.)

- On April 19, 2016, Plaintiff visited Evan M. Williams, MD, for dizziness and arm pain. (Tr. 733.) In his record summary, Dr. Williams indicates he reviewed Plaintiff's various symptoms; for "Gastrointestinal" he noted "Admits: diarrhea" and "Denies: nausea, vomiting, constipation, reflux, blood in stools." (Tr. 734.)

7

- On April 25, 2016, Plaintiff underwent an exam for an eye problem. (Tr. 737.) The records reflect the medical provider reviewed all symptoms, and noted the following for category Gastrointestinal: "go 8 to 10 times[], abdominal pain, cramping, [d]iverticular [d]isease." (*Id.*)

- On May 31, 2016, Plaintiff visited Smith again for her thyroid problem, reporting symptoms of weight gain, fatigue, headaches, and anxiety. (Tr. 776.) In a list of possible conditions, Smith noted after the category "Diarrhea/Constipation," "Yes: frequent bowel movements, secondary to colon surgery." (*Id.*)

On May 27, 2016, Physician Assistant Fitzloff provided a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" for Plaintiff. Fitzloff indicated that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressure in a work setting is markedly affected by her impairment. In support, Fitzloff noted the following: "[D]ue to large amount of colon resection she has frequent bowel movement (8–10 [times] per day on average [and] 2–3 days a week with 30 [times]/day)." (Tr. 800.) Approximately one week later, Fitzloff provided a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" for Plaintiff in which Fitzloff noted that Plaintiff can sit for "less than about 6 hours in an 8-hour workday," that Plaintiff needs to periodically alternate sitting and standing to relieve pain or discomfort, and that Plaintiff's pushing and/or pulling ability is limited in her upper extremities because prolonged sitting and push/pulling increase Plaintiff's bowel movements. (Tr. 803.)

At the hearing before the ALJ on June 16, 2016, Plaintiff testified that her diverticulitis was not cured and her condition of frequent and incontinent bowel movements had been continuous since her surgery in January 2015. She explained that

8

her complaints about bowel issues disappeared from the record because she was told by

Dr. Osborne, Dr. Grohn, and Physician Assistant Fitzloff that those issues would be a

norm for her. (Tr. 61–65.) Plaintiff further testified that she talked about her bowel issues

almost every time she visited Fitzloff, but Fitzloff might not have documented it because

it was not the reason for her visit. (Tr. 66.)

### III.    The ALJ's Findings and Decision

In his decision dated August 30, 2016, the ALJ found that Plaintiff was not

disabled as defined by the Social Security Act and denied Plaintiff's application for DIB.

(Tr. 27.) The ALJ first decided that Plaintiff met the insured status requirements of the

Social Security Act through December 31, 2019.[3] (Tr. 13.) Then the ALJ proceeded

through the five-step evaluation process provided in the social security regulations. *See*

20 C.F.R. § 404.1520(a)(4). The steps are as follows: (1) whether the claimant is

presently engaged in "substantial gainful activity"; (2) whether the claimant is severely

impaired; (3) whether the impairment meets or equals a presumptively disabling

impairment listed in the regulations; (4) whether the claimant can perform past relevant

work; and, if not (5) whether the claimant can perform other jobs available in sufficient

numbers in the national economy. *Id*. § 404.1520(a)–(f).

---

[3]      *See Fishbaugher v. Astrue*, 878 F. Supp. 2d 939, 942 n.2 (D. Minn. 2012) ("A claimant has to establish 'the existence of a disability on or before the date that the insurance coverage expires.'") (quoting *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984)).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period since her alleged onset date of October 8, 2014. (Tr. 13.) At step two, the ALJ found that Plaintiff had the following severe combination of impairments: diverticulitis, hypothyroidism, obesity, cervical degenerative disc disease, and depression and anxiety. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14–17.) The ALJ considered listings for both physical and mental impairments. (*Id.*)

Before reaching step four, the ALJ found that Plaintiff had the RFC to perform "a range of work at a 'light' level of exertion, as that term is defined in 20 CFR 404.1567(b), with all of the following additional limitations: she can only occasionally reach overhead; and she is limited to simple routine tasks." (Tr. 17.) The ALJ stated that he made these findings after considering all of Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. (*Id.*) With regard to opinion evidence, the ALJ gave the opinion of the non-examining state agency medical consultant some evidentiary weight, gave the non-examining state agency psychological consultant little evidentiary weight, and gave the opinion of Physician Assistant Fitzloff in the two Medical Source Statements of Ability To Do Work-Related Activities little evidentiary weight. (Tr. 25.) The ALJ also considered a hospital discharge summary prepared by the colorectal surgeon regarding Plaintiff's need to go on disability, and gave this opinion little evidentiary weight. (Tr. 26.)

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.*) He based his step-four finding on the evidence overall, including the vocational expert's testimony "that an individual having a RFC substantially similar to that found above would be incapable of performing any of Plaintiff's past relevant work." (*Id.*)

The ALJ continued to step five and found, pursuant to the vocational expert's testimony, that Plaintiff could perform additional jobs that exist in significant numbers in the national economy in light of Plaintiff's age, education, work experience, and RFC. (*Id.*) He found that Plaintiff could perform the requirements of representative occupations including, but not limited to, assembler electrical accessories, electronics worker, and inserting-machine operator. (Tr. 27.) Thus, the ALJ concluded at step five that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## DISCUSSION

### II.    Standard of Review

Congress has established the standards by which social security disability insurance benefits may be awarded. The SSA must find a claimant to be disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Statements about pain or other symptoms "will not alone establish" disability; instead, "there must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a).

The claimant bears the burden of proving that she is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010) (citations omitted). "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence,' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). The Court must "search the

record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003).

If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court may not substitute its own opinion for that of the ALJ's, even if the Court would have reached a conclusion different from that of the factfinder. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## III.    Analysis of the ALJ's Decision

Plaintiff argues that the ALJ erred in (1) improperly rejecting Plaintiff's subjective complaints that were consistent with the record as a whole; and (2) making an RFC assessment inconsistent with objective evidence regarding Plaintiff's limitations of severe impairments. (Pl.'s Mem. 13–16.) The Commissioner disagrees and contends that (1) substantial evidence supported the ALJ's determination that Plaintiff was not credible; and (2) substantial evidence supported the ALJ's RFC evaluation and finding that Plaintiff could do a reduced range of light work. (Def.'s Mem. 11–13.)

### A.  The ALJ's decision to discount Plaintiff's subjective complaints regarding the severity of her bowel symptoms is supported by substantial evidence.

Plaintiff asserted that urgent, frequent, and unpredictable bowel movements, an average of 8 to 10 times per day, but as frequent as 30 times per day, was continuous since her surgery in January 2015 and prevented her from sustaining a full-time job.

(Tr. 60–61.) The ALJ discredited this allegation and concluded that "[Plaintiff's] central allegation of a frequent, urgent need to defecate somewhere on the order of 30 times per day is not supported by the administrative record overall." (Tr. 24.) The ALJ observed that "[f]or months, the claimant's abdominal complaints were Plaintiff's primary problem, and the notes made in connection with every visit clearly reflect this." (*Id.*) He noted that this condition seemed to have peaked around April 27, 2015, when Plaintiff complained that she would have 20 bowel movements in a day every couple of weeks. (Tr. 23.) He continued, "[o]ddly, however, bowel complains[] disappear form the record almost entirely after that, with only occasionally mention of diarrhea and bowel movement frequency, albeit more as an aside in visits for other maladies." (*Id.*) Based on this dramatic change, the ALJ concluded that "the record does not substantiate allegations that the claimant had so many bowel movements that she could not work for anything approaching a continuous period of at least 12 months. Instead it looks more like this might have been the case for perhaps a couple of months in 2015." (Tr. 23–24.)

Plaintiff argues that the ALJ's credibility assessment is flawed in several respects. She claims: (1) the ALJ is simply incorrect because the medical records do continue to reference frequent bowel movements, through at least December 2015; (2) the ALJ fails to consider Plaintiff's explanation that she stopped complaining  and seeking treatment for her frequent bowel movements because she was informed that her bowel issues would be a new norm; and (3) in this instance, the absence of evidence is not evidence of an improved condition, or of the lack of ongoing symptomatology. (Pl.'s Mem. 13–16.) In response, the Commissioner argues that Plaintiff's treatment notes do not substantiate her

claim that the doctors told her she would have to adjust to her bowel movement frequency. Rather, both Dr. Osborn and Dr. Grahn recommended further treatment and invited Plaintiff for follow-ups, but Plaintiff stopped seeking treatment. This, the Commissioner argues, strongly supports the ALJ's conclusion that her frequent bowel movements were not continuous.

An ALJ "may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). In evaluating Plaintiff's credibility regarding the extent of her symptoms, "the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead him to reject the claimant's complaints." *Jeffery v. Sec'y of Health & Human Servs.*, 849 F.2d 1129, 1132 (8th Cir. 1988).

The Eighth Circuit's decision in *Polaski v. Heckler* outlines factors that the ALJ must consider in evaluating a claimant's subjective complaints. In addition to objective medical evidence, the ALJ must examine "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions." 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ's obligation to consider the above factors does not mean that the ALJ is required to discuss each factor individually or in depth. *See Hanson v. Colvin*, No. 12-cv-961 (TNL), 2013 WL 4811067, at *16 (D. Minn. Sept. 9, 2013) ("While the ALJ must consider the

above factors, the ALJ need not discuss each one individually. . . ."); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth." (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996))). Rather the ALJ may conclude that the claimant's subjective complaints are inconsistent with the evidence as a whole "so long as the ALJ 'detail[s] the reasons for discrediting the testimony and set[s] forth the inconsistencies found.'" *Hanson*, 2013 WL 4811067, at *16 (quoting *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008)). As a general matter, credibility determinations "are the province of the ALJ," and the Court will defer to the ALJ's decision "as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).

Here, the ALJ's credibility decision is adequately articulated with good reasons. First, the ALJ determined that "the record does not substantiate allegations that the claimant had so many bowel movements that she could not work for anything approaching a continuous period of at least 12 months." (Tr. 23–24.) In making this determination, the ALJ went through Plaintiff's medical records thoroughly, and set forth the inconsistency between Plaintiff's allegations and objective records by pointing out the drastic contrast between Plaintiff's medical records before and after April 2015. (Tr. 25.) With respect to the *Polaski* factors, the ALJ examined Plaintiff's prior work record. (Tr. 53–59.) As to Plaintiff's daily activities, the ALJ considered the orthopedic specialist's observation that Plaintiff "did not need assistance with activities of daily

16

living," and that Plaintiff went on vacation on July 18, 2015. (Tr. 22.) As to the duration, frequency, and intensity of Plaintiff's bowel symptoms and their functional restrictions, the ALJ considered Plaintiff's treating provider Fitzloff's observation that pushing, pulling, and prolonged sitting were limited because they would increase the frequency of bowel movements. (Tr. 25.) And as to precipitating and aggravating factors, the ALJ considered Plaintiff's colorectal surgeon's opinion that Plaintiff's "diverticulitis flare seemed to be precipitated by stress from her work as a pharmacy technician." (*Id*.) Because the ALJ is not required to discuss each factor individually or in depth, this Court concludes that the ALJ's credibility determination was adequately explained.

Furthermore, this Court concludes the ALJ's credibility finding is also supported by substantial evidence. At the hearing, in response to the ALJ's inquiry as to the drastic change in the medical records before and after April 2015, Plaintiff gave two explanations. First, she stated that while her frequent bowel movements were continuous, she stopped complaining about them because she was told by Dr. Osborne, Dr. Grohn, and Physician Assistant Fitzloff that this would be a norm for her. (Tr. 65.) Second, she stated that she did talk about her continuous bowel condition almost every time she visited Fitzloff, and Fitzloff did not write it down possibly because it was not her chief complaint on that visit. (Tr. 66.) While these two explanations are somewhat inconsistent in and of themselves—in one she says did not continue to complain, in the other she says she did continue to complain—there is further support for the ALJ's finding because there are records contradicting both of the explanations.

As to Plaintiff's first explanation, there is no objective evidence that either Dr. Osborne, Dr. Grohn, or Physician Assistant Fitzloff had advised Plaintiff to accept her excessive bowel movements as a norm. The only thing close to this allegation is Dr. Grohn's note that "[a]s expected, some stool frequency, urgency, and alteration in bowel function can occur" after a hemicolectomy. (Tr. 606.) This statement, however, suggests a medical possibility, and does not confirm Plaintiff's condition would indefinitely continue. Moreover, rather than suggesting resignation, both Dr. Osborne and Dr. Grohn suggested further treatment. On April 10, 2015, Dr. Osborne noted that he thought Plaintiff's anxiety was "playing a significant role in her current symptomatology especially given that she has been studied extensively and all of her studies have been normal postoperatively." (Tr. 602.) In response to Plaintiff's complaint of diarrhea, Dr. Osborne referred her to Physician Assistant Fitzloff for anxiety treatment and advised her to come back for a colonoscopy in a month if she was still having altered bowel habits. (Tr. 600–02.) Similarly, during a visit on April 27, 2015, in response to Plaintiff's complaint of 8 to 10 bowel movements per day, Dr. Grohn recommended Plaintiff have a clostridium difficile (C. difficile) test, drink plenty of fluids, and increase the fiber in her diet. (Tr. 604–06.) Dr. Grohn also talked to Plaintiff about possibly doing a sigmoidoscopy to assess the anastomosis. (*Id*.) But Plaintiff declined, stating she "fe[lt] like things are getter better." (*Id*.) Dr. Grohn further advised Plaintiff to come back for follow up in eight weeks, "sooner if [Plaintiff] has worsening concerns." (*Id*.) The fact that both doctors recommended further treatments and follow-up if necessary contradicts Plaintiff's allegation that her doctors told her to accept the excessive bowel movements

as a new norm. And the fact that Plaintiff never returned for treatment despite both doctors' explicit invitation supported the ALJ's inference that Plaintiff's condition had improved.

There is also record evidence contradicting Plaintiff's second explanation that Physician Assistant Fitzloff did not write down Plaintiff's bowel complaints when it was not her chief reason for the visit. For example, on May 15, 2015, Fitzloff noted that Plaintiff "had a really good visit [with a colorectal surgeon] and feels better about her gastrointestinal symptoms" even though this visit was for Plaintiff's depression and anxiety. (Tr. 616–17.)

Plaintiff also argues that the ALJ's credibility decision is wrong because there are records of diarrhea after April 2015. Between May and December 2015, Plaintiff reported frequent bowel movements on May 26, June 10, December 3, and December 17. (Tr. 744, 752, 764, 770.) These records, however, only show the existence of diarrhea; they do not substantiate Plaintiff's allegation of 8 to 10 bowel movements or more per day. None of these reports mention the specific frequency. And prior to these records, on April 10, 2015, Plaintiff reported diarrhea and the note indicated that "she will have up to three bowel movements per day." (Tr. 641.) Furthermore, Plaintiff reported frequent bowel movements only four times in her over twelve medical visits during May to December in 2015. This infrequency suggests that there was an improvement in Plaintiff's bowel symptoms.

Finally, Plaintiff argues that "the absence of evidence is not evidence of an improved condition, or lack of ongoing symptomatology." (Pl.'s Mem. 14.) This

argument misses the point. Instead of basing his adverse credibility decision solely on the absence of evidence, the ALJ's conclusion is based on the drastic contrast between medical records before and after April 2015. Moreover, case law in the Eighth Circuit has established that absence of continuous complaint and treatment may be used to support the ALJ's credibility analysis. *See, e.g.*, *Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) (upholding the ALJ's decision not to fully credit claimant's subjective complaints of pain and limitation because "evidence showed a lack of consistent ongoing treatment and a lack of consistent complaints and objective symptoms"); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("[The claimant's] complaints of disabling pain are also undercut by the eight-month period during which he sought no medical care.").

Based on all of the above, this Court concludes the ALJ adequately articulated his credibility determination and gave proper reasons for discounting Plaintiff's subjective complaints of severe continuous bowel symptoms. The ALJ's credibility determination is also supported by substantial evidence. Therefore, this aspect of the ALJ's decision should be affirmed.

## B. The ALJ's RFC determination is flawed because he did not fully develop the record to consider the effect of Plaintiff's condition.

Although the ALJ's decision to discount Plaintiff's subjective complaints about the severity of her bowel symptoms is supported by substantial evidence, the ALJ's decision to completely ignore the existence of supported symptoms is not. As discussed above, and as acknowledged by the ALJ (Doc. No. 23), there are records showing that Plaintiff had symptoms of frequent bowel movements that were continuous through at

least December 2015. (Tr. 744, 752, 764, 770.) While the fact that the reports of frequent bowel movements were not part of Plaintiff's chief complaints may be suggestive of the frequency and intensity of the symptom, it does not justify the ALJ completely ignoring the symptom. *See Ciecalone v. Colvin*, No. 4:13-cv-28-NAB, 2013 WL 6049986, at *2 (E.D. Mo. Nov. 15, 2013) ("Although the ALJ disagrees with the frequency at which [claimant] and her treating physician assert that she needs to use the restroom, the ALJ cannot completely ignore this issue.").

Social security hearings are non-adversarial. *See Reeder v. Apfel*, 214 F.3d 984, 987 (8th Cir. 2000). "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). The ALJ's duty to develop the record also extends to cases where an attorney represented the claimant at the administrative hearing. *See Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983). An ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Id.* (citing *Snead*, 360 F.3d at 839). Here, the record reflects that Plaintiff did not return to her gastroenterologist for treatment after April 2015. However, there is mention of Plaintiff's bowel issues in records between April and December 2015. What the records do not reflect is the severity of Plaintiff's gastrointestinal problems during that time. Determining the severity of Plaintiff's gastrointestinal problems was a crucial issue to determining Plaintiff's RFC and her ability to work. "Failing to develop the record is reversible error when it does not contain

enough evidence to determine the impact of a claimant's impairment on his ability to work." *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012).

This Court finds *Snead v. Barnhart*, 360 F.3d 834 (8th Cir. 2004) instructive. There, the ALJ accepted as credible the evidence showing that the claimant suffered from ongoing dilated cardiomyopathy that caused heart failures. *Id*. at 839. The ALJ denied benefits, however, explaining that the claimant's acute heart failures were resolved rapidly after treatment and thus "there is no clinical documentation to support an ongoing disability for 12 full months." *Id*. The Eighth Circuit reversed and remanded the case to the Commissioner, reasoning that the ALJ failed to fully and fairly develop the record regarding whether and to what extent the claimant's uncured cardiomyopathy may have affected the claimant's ability to work because there is uncontradicted evidence of the claimant's uncured heart condition. *Id*.

Here, while there is substantial evidence supporting the ALJ's conclusion that Plaintiff's excessive bowel movements might have improved after the spring of 2015,[4] there is also substantial evidence showing that Plaintiff suffered from recurrent diverticulitis as well as continuous frequent bowel movements (maybe 3 to 4 times on an average day) through at least December 2015. (*See, e.g.*, Tr. 744, 752, 764, 770.) And the vocational expert testified at the hearing that an individual who would require unscheduled breaks at random intervals resulting in 10% to 20% off-task time would be inconsistent with competitive employment. (Tr. 82–83.) Faced with this evidence, the

---

[4]    The record reflects Plaintiff had a flare of excessive bowel movements at the end of April.

ALJ should have followed-up with Plaintiff's treating providers or ordered additional consultative examinations to obtain their opinions as to the intensity and limiting effect of Plaintiff's continuous diarrhea to help him assess Plaintiff's RFC. The ALJ's failure to develop the record on this issue to determine whether and how Plaintiff's symptom of frequent bowel movements would interfere with her ability to work requires remand. *See Snead*, 360 F.3d 834 (remanding the case for failure to develop the record fully and fairly); *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992) (remanding the case for the ALJ's failure to order consultative examinations); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.") (quotations omitted); *see also Zeman v. Comm'r of Soc. Sec.,* No. 6:15-CV-151-TC, 2016 WL 8710452, at *2 (D. Or. Jan. 15, 2016) (concluding "a remand [was] necessary to develop the record regarding whether plaintiff's need for restroom breaks during the workday precluded her from performing her past relevant work as actually performed or as generally performed"); *Land v. Astrue*, No. 11-5024, 2012 WL 1409723, at *5 (W.D. Ark. Apr. 23, 2012) (remanding so the ALJ could more fully and fairly develop the record regarding plaintiff's physical RFC in light of plaintiff's reported bowel condition); *Wait v. Astrue*, 495 F. Supp. 2d 1131, 1134 (D. Kan. 2007) ("The court found one treatment note in the record where plaintiff complained of diarrhea. The court also found support for plaintiff's claim of incontinence in a report by plaintiff's representative and plaintiff's report of daily activities. The court determined that this was a close call, but

decided that there was sufficient evidence in the record to require the ALJ to more fully develop the record on the issue of incontinence.").

The RFC assessment for Plaintiff as currently proscribed assumes that Plaintiff would not experience any loss of productive time during a work day; it has no limitations associated with more than usual off-task time or absenteeism due to abdominal pain or frequent and unpredictable bowel movements. Because of the underdeveloped record, this RFC is unreliable. *See Snead*, 360 F.3d at 839 (holding that the RFC is unreliable because of the ALJ's failure to develop the record regarding the limiting effect of the claimant's uncured heart condition); *see also Holstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001) (holding that the RFC is insufficient as it did not include all of the claimant's impairments, limitations, and restrictions). Therefore, on remand, after the record is more fully developed as described above, the ALJ must consider Plaintiff's RFC.[5]

## RECOMMENDATION

Based on the foregoing, and all the files, records, and submissions herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 13) be **GRANTED IN PART**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 16) be **DENIED**;

---

[5]    This Court's ruling makes no presumption as to whether Plaintiff will ultimately be granted or denied benefits on remand. This Court notes, however, that at the time of the issuance of the Report and Recommendation, Plaintiff's insurance coverage has not expired; therefore, it appears that Plaintiff could bring yet another petition.

3.      This matter be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g)

for further proceedings consistent with this Report and Recommendation; and

4.      Judgment be entered accordingly.


Date: May 18, 2018                          *s/ Becky R. Thorson*
                                            BECKY R. THORSON
                                            United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within fourteen (14) days after being served a copy" of the Report and Recommendation. A party may respond to those objections within fourteen (14) days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).